## WALDO, HALL & CO. *v.* HUGH N. BECKWITH.

CONTINUANCE ON GROUND OF ABSENT EVIDENCE.—A continuance will not be granted because of the absence of evidence which, if present, would be inadmissible. Hence, the absence of a transcript of a former recovery for the same cause of action will not authorize a continuance, where there is no plea under which such transcript would be admissible.

EVIDENCE OF FORMER RECOVERY INADMISSIBLE, WHEN.—Under the general issue in assumpsit, evidence of a former recovery not pleaded is inadmissible.

DILIGENCE MUST BE SHOWN TO PROCURE CONTINUANCE.—The absence of evidence is no ground for a continuance where the party applying for the continuance has not used reasonable diligence to procure the evidence in time for the trial.

PROOF OF PARTNERSHIP AS AGAINST DEFENDANTS.—A plaintiff is not required to make as strict proof of a partnership among the defendants as would be necessary to show a partnership among plaintiffs. It is sufficient to show that the defendants have acted as partners, and by the conduct, declarations, and course of dealing, have induced others to regard them as partners.

COMMUNICATION TO ATTORNEY NOT PRIVILEGED, WHEN.—A communication made by a client to his attorney for the purpose of being made public, is not privileged; as where the client informs his attorney of a partnership between himself and others to enable him to sue on a claim due the firm.

SPANISH LAW OF PASTURES.—The old Spanish law of pastures does not determine the degree of care and attention to be required of one who undertakes for hire to keep a band of work-oxen over the winter.

EXCESSIVE DAMAGES AS GROUND OF NEW TRIAL.—A new trial can not be granted because of excessive damages, unless the jury have mistaken the principles regulating the damages, or have been guilty of some gross error showing improper feeling or bias on their part.

APPEAL from Santa Fe county. The opinion states the case sufficiently.

*T. D. Wheaton,* for the appellants.

*Ashurst and Smith,* for the appellee.

By Court, BENEDICT, J.:

This cause has been more than six years in litigation. Once before it was in this court upon appeal. Beckwith had a verdict and judgment in the district court, and Waldo, Hall & Co. appealed at the term of this court in 1854. That judgment was reversed and the cause sent to Santa Fe county to be tried *de novo.* See *Waldo* v. *Beckwith, ante,* 97. A verdict and judgment was again rendered, though increased in amount in Beckwith's favor, and again an appeal was taken. The errors which the appellants, through their counsel, assign, are: 1. That the court should have granted a continuance. 2. Admitting improper testimony to go to the jury. 3. Giving improper instructions and refusing proper ones. 4. Refusing to grant a new trial.

We will examine, in the first place, the first assignment. At the term when this judgment was rendered, defendant's counsel made an affidavit for a continuance, alleging the want of a transcript of a record from the circuit court of the county of Jackson, Missouri, to prove that the same identical cause of action upon which this suit is founded, between the same identical parties to this suit, has been tried and determined at the last term of the said circuit court; and that a recovery was then had upon the same; and that the information reached here by the April mail from the United States. Applications to postpone the trial of a cause to a future day or term are addressed to the sound discretion of the court, and the territorial statute provides that they shall be supported by oath, unless the facts be within the knowledge of the court.

The affidavit in this cause is very guarded and indefinite as to which party had been instituting the suit and carrying it to a conclusion, or who had recovered. For the purposes of the motion the court had the whole record before it, as well as the affidavits. Before the first trial in the court below, the defendants filed a plea in abatement, set-

ting up the then pendency of the suit for the same cause between the same parties in the Jackson circuit court of Missouri. The plea was demurred to and the demurrer sustained, and on appeal to this court, the ruling of the court below was affirmed. To its opinion upon that point this court still adheres. A copy of the record was set forth by averment in the plea, and is still in the files of this cause, and the court was authorized to regard it as being a portion, at least, of the transcript upon which the plea in abatement had been founded. We are of opinion that the cause did not stand in such situation that the transcript could have been admissible if present at the trial; and the rule is well laid down in *Warburton and King* v. *Aken and Little*, 1 McLean C. C. 460, that upon a motion for continuance for the want of testimony, if the facts stated would not be admissible in evidence, the motion must be overruled. Now, in this cause, no answer or plea stood upon which issue had been joined, except the general answer or issue as in assumpsit. No plea of former recovery during the continuance of this suit had been set up. There was no issue upon which the record could have been admissible as evidence, and hence upon this ground alone the court did well in overruling the motion. It is the duty of all courts, under the circumstances of each case, to take care that in their determination of motions for continuances injustice is not done, either by precipitate trials or wanton delays. Diligence should appear upon the part of the party moving for a postponement, or a reasonable excuse why it has not been exerted. In this case the information came to the counsel by the April mail, and the cause was tried in the latter part of June. For years this suit had been in progress. The defendants well knew, or should have known, how it stood in court, and when it would come on for trial. Why did they not, by the April mail, send the transcript along with the information that it existed? Why did they let May pass? If it was important, did they not know it? The whole history of this cause proves that the defendants could not have been ignorant of the steps proper for their own defense. It would have been great injustice,

after so long a delay, for the court to have compelled the plaintiff still to postpone it to give the defendants and their counsel more time for correspondence about a matter in which they had failed in diligence by not sending the transcript, as they might have done, had they deemed it of importance in their defense.

We shall now direct our attention to the error assigned in refusing a new trial, and shall consider the other two assignments under this head.

Beckwith brought this action to recover pay for the wintering of a stock of working oxen. It became necessary for him to prove the partnership of the defendants as a joint liability to pay for the keeping of the cattle. He had averred the firm of Waldo, Hall & Co., to consist of Jacob Hall, David Waldo, and Wm. McCoy. Defendants' counsel insists in argument, that this averment is not sustained by the proof, and that for this cause the plaintiff is not entitled to a verdict and judgment against them. The courts do not require the proof of the partnership of defendants to be so strictly made as that of such relation between plaintiffs. Mr. Greenleaf, in his treatise on evidence, says that it is sufficient to prove that defendants have acted as partners, and that by their habit and course of dealing, conduct, and declarations, they have induced those with whom they have dealt, to consider them as partners.

Patten, a witness, swore that he knew a firm of Waldo, Hall & Co., who contracted to carry the mail that year from Independence to Santa Fe, and that they hired at the former place, and their names were David Waldo, Jacob Hall, and Wm. McCoy, but did not know that they were engaged in the freighting business. This testimony, standing in no manner contradicted nor its credibility assailed, establishes the fact that at Independence these defendants, by their firm name, were a partnership, and that they all resided at the very place where they did business as the firm of Waldo, Hall & Co. The witness does not pretend to give the extent in various kinds of business; that they held themselves out to the world as partners, but that that year they had contracted to carry the mail from that place to this: Hugh

N. Smith, an attorney of this court and counsel for plaintiff, was called to be sworn on part of Beckwith to prove the partnership, and the defendants objected on the ground that his information was derived from defendants by confidential communications made by them to him while he was their attorney. It was for the court and not the witness to determine as to the competency of the testimony, and it overruled the objection. Smith testified that he had been employed by defendants at one time to bring some suits for them as a firm, and that he thinks he must have been informed by Hall that the firm consisted of David Waldo, Jacob Hall, and William McCoy. He also thought he had learned it from some other source. The suits were concluded, and no objections were made to the manner in which they were brought. Now we can not regard this testimony as such confidential communications as were protested against being given in evidence. Smith was informed of the names of the members of the firm, for what purpose? For the express purpose of being published. He was to institute suits for them, and the publication, in legal form, was to enable them to prosecute them. These had been ended. What, then, had transpired? These parties by their own acts had imparted the fact of their existence, not only to third persons, but had averred, insisted, and succeeded upon the fact in courts, upon records, before judges and other officers, and in the face of the world. This must have been, for Smith says he was employed to bring some suits for the firm, and that they were concluded, and that the business met no objection upon the ground that it was prosecuted in the names of these defendants. We know what is meant by the institution, carrying on, and terminating a suit. It is impossible that it could have been done, as Smith says, without such publication of the members of the firm as to make it an act of the parties, far beyond any principle of law or practice of courts, that would protect it as a confidential communication to an attorney. It was made known to the attorney and at the same time, in the same acts, to third persons, courts, and the public. It was not in its nature private, and could in no sense

be termed the subject of a confidential communication, and we see no error that the court committed in permitting Smith to testify to the facts done by the defendants, disclosing and showing their partnership. Therefore by his testimony, with that of Patten, we must consider the point established, that these men, now defendants, were partners, transacting business as such in acts of the most public and permanent character. From this point we may proceed to say that the existence of the firm, as shown by the evidence, became notorious and widely known. McCutcheon swears that Hall was in Santa Fe in 1850, and did business in the name of the firm; stated that it consisted of himself, David Waldo, and Wm. McCoy, and that he was its agent. Hunt swears, referring to the same time in Santa Fe, Hall told him the same thing as to who were the members of the firm. Goods were delivered and the bills were in the name of the firm, and Hall signed bills in its name. Preston Beck speaks of the train of Waldo, Hall & Co. Stevens, sheriff, received a letter from Wm. McCoy requesting him to collect money for Waldo, Hall & Co. Hall told witness Cummings that the cattle in question were the company's oxen. We feel bound to say that for all the purposes of this suit the proof of the partnership was amply made out, and the jury should have found as they did as to that fact. It is worthy of notice, also, that defendants offered no evidence to disprove the testimony as to partnership, nor to lessen its weight. All the other points will now be considered in connection with the refusal to grant a new trial. Counsel for appellants insist that the old Spanish law as to pastures should be applied to Beckwith in defining the care and attention which he should have bestowed upon the keeping of the cattle. This court decided against such application in this same cause before, and it now adheres to the decision then announced with increased confidence as to its correctness. The court then did right in refusing the instructions the appellants asked for upon that point. We think that all of the instructions given were substantially correct, and therefore no ground for new trial touching them is to be found. The damages found by the jury were five hundred dollars, and

it is contended that they were excessive.  It is laid down in
5 Mason C. C. 497, and we think substantially correct, that
a new trial can not be granted on account of excessive dam-
ages unless the jury have mistaken the principles of law
which ought to regulate damages, or have been guilty of
some gross error which shows an improper feeling or bias
on their part.  It seems the cattle in question were working
oxen that had been worked from the states and arrived with
a train late in the fall.  All the witnesses who saw them
describe them as having been very poor and in bad condi-
tion.  It also appears that the winter of that year was very
cold, hard, and severe; that the majority of the cattle that
came that year from the states were very poor when they
reached here; and one witness, McCutcheon, swore that
those in best order were most apt to die.  Hunt says the
cattle in question remained after they arrived several days
in Santa Fe, and sheltered themselves under the portals of
the houses.  Dr. Cummings swore that he resided about
twelve miles from Beckwith's ranch, where the oxen were
driven to winter; saw the cattle, in number about fifty or
sixty, in charge of one Martin, pass his house about the
fourth of December.  They were on the way to Beckwith's,
and some died on the way.  He was at Beckwith's after-
wards, and saw the cattle, which he describes as being
well fed with a plenty of good fodder and corn and carefully
tended.  Beckwith wintered for him with these cattle some
for witness, and when spring came they were in good con-
dition.  Corn and fodder were very high that year, and it
was worth from twenty to twenty-five dollars per head to
winter cattle that year.  He saw Hall a short time after he
had been to Beckwith's, and Hall told witness that he had
sent Martin with his cattle down to Beckwith's.

Charles Hughes swore that he was Beckwith's herder.
That about the fourth of December Martin brought the
cattle.  Forty-four were receipted for.  They were in very
bad condition and three or four died the first night they ar-
rived.  His testimony shows them to have been well fed,
with a plenty of good corn and fodder, and with the horses
and mules of Beckwith and cattle of Cummings.  Noth-

ing appears in his statements to show that the cattle were not well taken care of under the circumstances. Beckwith had fodder still left in the spring, yet they continued on dying until, when April came, only one or two were living. Witness thought it was worth twelve dollars per head to feed them and take care of them during the winter.

In view of the loss of these cattle, so nearly complete in its character, at the· end of four months, a violent distrust springs involuntarily into the mind that Beckwith grossly neglected or ill-treated the property of the company committed to his keeping. The mind ponders with much anxiety over this testimony, to see if a place can be found upon which justly to rest this distrust upon Beckwith's faultiness. We then find that the cattle were brought to this territory upon the verge of a winter of extraordinary severity; that they had doubtless been worked the long and wearisome route on the plains from the states. They arrived here poor and in bad condition, unused to this climate and country. They had to encounter all the rigors of the unusual winter with their vital energies so exhausted that they could not recruit sufficiently to bear up against the wastings of the cold and the storm. Some of them died by the way while being driven to the ranch; some of them died the first night they were delivered there. The loss of these can in no way be attributed to Beckwith. We can not refuse to give credit to the testimony of Cummings and Hughes. They both acquit him of any culpable neglect or ill-treatment, and no witness appears against them. None was attempted to be introduced. Beckwith stands in the affair as treating the oxen as he treated his own beasts or the cattle of Cummings, and as a prudent, careful man would treat his oxen in this country. The loss and misfortune was heavy upon the company, but that does not exonerate them from paying the appellee. The damages found by the jury seem large, and doubtless they are; but are they so much so as to require this court to send the cause back to be again tried, tested by the rules hereinbefore incorporated? We think not. It was a matter peculiarly fitted for a jury to determine. Two juries have found

in Beckwith's favor. The corn and fodder was of great price that winter. The anxiety and trouble to him must have been very great, and if the damages are somewhat excessive, they are not so as to justify this court in reversing the judgment of the court below. The appellants upon the trial in the district court offered no evidence to reduce the damages, but let the cause go to the jury upon a second trial with no other testimony than Beckwith produced. The presumptions now are all in favor of the verdict, and the defendants below must abide by the judgment of the district court.

Judgment affirmed with costs.